UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

REPIFI VENDOR LOGISTICS, INC. §
§
v. § CIVIL NO. 4:20-CV-448-SDJ
§
INTELLICENTRICS, INC., ET AL. §

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants IntelliCentrics, Inc.'s and IntelliCentrics Global Holdings, Ltd.'s (together, "IntelliCentrics") Motions to Dismiss. (Dkt. #7, #16). Plaintiff Repifi Vendor Logistics, Inc. ("Repifi") filed a response in opposition, (Dkt. #11), IntelliCentrics filed a reply, (Dkt. #12), Repifi filed a sur-reply, (Dkt. #14), and the Court held a hearing on the motions, (Dkt. #25). Having considered the motions, the arguments presented by the parties, and the relevant law, the Court concludes that the motions should be **GRANTED**.

### I. BACKGROUND

Repifi is the owner of U.S. Patent No. 10,304,268 (the "'268 patent"), which is titled "Visitor Credentialing System for an Access-Controlled Environment." According to the '268 patent and Repifi's complaint, the '268 patent "is directed to a method for credentialing visitors to an access-controlled environment by an access administrator." '268 patent col. 1 ll. 56–58; *see also* (Dkt. #1 ¶ 7). Specifically, claim 1 of the '268 patent, the claim IntelliCentrics is alleged to have infringed, recites the following:

1. A method for credentialing visitors to an access-controlled environment by an access administrator, comprising the steps of:

1

(a) providing a smart-phone based credentialing platform having global positioning system (GPS) capability;

(b) providing an electronic badge having a display having electronically controlled and changeable indicia thereon, the badge adapted communicate with a smart-phone;

(c) enrolling a visitor into the credentialing platform by entering visitor information based on requirements of the administrator;

(d) approving, by the administrator, that the requirements of the step of enrolling are met;

(e) requesting, by the visitor, at least one location for which access is desired and submitting the at least one location to the administrator via the credentialing platform, said location having a pre-defined area;

(f) approving, by the administrator, the request for access at the at least one location;

(g) checking in on the smart-phone, by the visitor, via the credentialing platform, to establish check-in data including check-in time and date by the visitor, wherein the check-in data is recorded by the credentialing platform;

(h) communicating between the smart-phone and the electronic badge, indicia data for forming a display image on the display on the electronic badge;

(i) displaying on the badge display indicia showing access by the visitor is authorized to the location during the specific time interval;

(j) recording, by the credentialing platform, geo-location data of the visitor during the visitor's presence in the pre-defined area;

(k) checking out of the system when the visitor departs the pre-defined area of the at least one location, establishing check-out data, including check-out time and date and geo-location;

(l) recording, by the credentialing platform, the check-in data, the geo-location data and the check-out data of the visitor; and

(m) removing from the badge display, the indicia showing access by the visitor is authorized.

'268 patent col. 6 l. 54–col. 7 l. 29.

In essence, the claimed method streamlines the credentialing and check-in/out processes for visitors to access-controlled facilities, such as healthcare facilities and office buildings. The credentialing platform is provided in the form of a smart-phone software application ("app"), through which visitors can input their information and obtain approval from the facility administrator. Once approved, visitors can then use the app to request access to a pre-defined, access-controlled location. Once access is granted, visitors can check in on the app after arriving at the facility. The app records the check-in information, such as the date and time, and communicates data to an electronic badge that causes the badge to reflect that the visitor is authorized. The app then, using the smart phone's GPS technology, tracks the visitor's location and automatically checks out the visitor when the visitor leaves the facility. The app records the check-out information and communicates data to the electronic badge, causing the badge to reflect that the visitor is no longer authorized.

Repifi alleges that IntelliCentrics has implemented a similar method using a smart-phone app and an electronic badge to facilitate visitor credentialing and checking in and out at healthcare facilities. Repifi filed this infringement suit against IntelliCentrics, claiming that IntelliCentrics's method infringes claim 1 of the '268 patent. IntelliCentrics now moves to dismiss Repifi's claims for failure to state a claim upon which relief can be granted, arguing that claim 1 of the '268 patent does not claim a patentable invention under 35 U.S.C. § 101.

## II. LEGAL STANDARD

**A. Rule 12(b)(6)**

Patent eligibility under Section 101 can often be resolved on a motion to dismiss. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("*Berkheimer I*"). When a Rule 12(b)(6) motion to dismiss for failure to state a claim challenges the eligibility of a patent, courts apply the same, well-known standard that applies to all Rule 12(b)(6) motions. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1357 (Fed. Cir. 2018) (per curiam).

In order to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). This involves a two-step inquiry. First, courts assess the allegations of the complaint and distinguish well-pleaded factual allegations from unsupported legal conclusions. *Id.* (quoting *Doe v. Robertson*, 751 F.3d 383, 388 (5th Cir. 2014)). The complaint need not lay out its factual allegations in significant detail, but it must be enough that, when accepted as true, the allegations suggest that the plaintiff's right to recovery is more than just speculative. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means that a complaint requires more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and courts need not assume the truth of legal conclusions framed as allegations. *Id.*

Second, courts must "ask whether the remaining allegations are sufficient to nudge the plaintiff's claim across the plausibility threshold." *Waller*, 922 F.3d at 599 (quotation omitted); *accord Iqbal*, 556 U.S. at 678. In other words, courts determine whether the complaint's factual allegations establish more than just a possibility of the plaintiff's success on its claims. *Waller*, 922 F.3d at 599. Making this determination is "a content-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## B. The *Alice/Mayo* Test

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." However, the Supreme Court has long held that Section 101 contains an implicit exception to patent eligibility for claims directed toward laws of nature, physical phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980); *accord Ass'n for Molecular Pathology v. Myriad Genetic, Inc.*, 569 U.S. 576, 589, 133 S.Ct. 2107, 186 L.Ed.2d 124 (2013). Relevant here, "[t]he abstract idea exception has been applied to prevent patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished.'" *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113, 15 How. 62, 14 L.Ed. 601 (1853)). In other words, "[a] patent is not good for an effect, or the result of a certain process because such patents would

5

prohibit all other persons from making the same thing by any means whatsoever." *Id.* (internal quotation marks omitted) (quoting *Le Roy v. Tatham*, 55 U.S. 156, 175, 14 How. 156, 14 L.Ed. 367 (1853)); *see also Diamond v. Diehr*, 450 U.S. 175, 182 n.7, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (holding that a patent may issue "for the means or method of producing a certain result, or effect, and not for the result or effect produced"). Courts must "therefore look to whether the claims . . . focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO*, 837 F.3d at 1314 (citations omitted).

The abstract-idea exception, "is not without limits," though, "for 'all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas,' and 'too broad an interpretation of this exclusionary principle could eviscerate patent law.'" *Ass'n for Molecular Pathology*, 569 U.S. at 589–90 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012)). Thus, "[w]hether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer I*, 881 F.3d at 1368.

To aid courts in making this determination, the Supreme Court has established a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible *applications* of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014) (emphasis added); *see also Mayo*,

566 U.S. at 77. First, courts must determine whether the claims are directed to a patent-ineligible concept. *Alice*, 573 U.S. at 217. If so, courts must determine whether there are additional elements beyond the patent-ineligible concept that "transform the nature of the claim" into a patent-eligible application. *Id.* (citation omitted). The Federal Circuit has recognized that "precision has been elusive in defining an all-purpose boundary between the abstract and the concrete." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015). However, courts may look to the Federal Circuit's decisions applying *Alice* and *Mayo* for the "substantial guidance" provided therein "in determining whether claims are unpatentable under the 'abstract idea' rubric." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("*Affinity Labs I*").

### III. DISCUSSION

### A. *Alice/Mayo* Step One: Whether Claim 1 is Directed to an Abstract Idea

#### 1.

At step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents*, 790 F.3d at 1346; *see also Affinity Labs I*, 838 F.3d at 1257 (stating that the first step "calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). In conducting this analysis, courts should not oversimplify key inventive concepts or downplay an invention's benefits. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337–38 (Fed. Cir. 2016); *see also McRO*, 837 F.3d at 1313 ("[C]ourts must be careful

to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." (quotation omitted)). Moreover, "it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

Abstract ideas, which are unpatentable, "are products of the mind, mental steps, not capable of being controlled by others, regardless what a statute or patent claim might say." *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1375 ("*Berkheimer II*") (Lourie, J., concurring in denial of rehearing en banc) (citing *Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972)). In the context of software applications, the dichotomy between patentable concrete ideas and unpatentable abstract ideas typically turns on whether the patent is directed to "an improvement in the functioning of a computer," which is patentable, or to a method that simply adds "conventional computer components to well-known business practices" or that recites "generalized steps to be performed on a computer using conventional computer activity," which is unpatentable. *Enfish*, 822 F.3d at 1338 (citing *Alice*, 134 S.Ct. at 2358–60); *see also Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) (holding that a patent must improve the computer's functionality rather than merely improve the experience of users who cannot or would rather not themselves use programming to improve their experience); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (holding that, while

the claim on its face recited "concrete, tangible components such as 'a telephone unit' and a 'server,' the specification ma[de] clear that the recited physical components merely provide[d] a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner").

For example, the Federal Circuit has deemed the following to be abstract ideas to which software patent claims were directed: providing out-of-region access to regional radio-broadcast content via a mobile software application, *Affinity Labs I*, 838 F.3d at 1258, a method for the wireless communication of information about the status of a moveable barrier, such as a garage door, *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1344–45 (Fed. Cir. 2019), tracking a user's computer network to provide tailored advertisements based on real-time data about the user and the user's location, *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F.App'x 882, 884 (Fed. Cir. 2019), providing automated entry to prospective property purchasers seeking to tour properties, *Consumer 2.0, Inc. v. Tenant Turner, Inc.*, 343 F.Supp.3d 581, 584 (E.D. Va. 2018), *aff'd* 796 F.App'x 752 (Fed. Cir. 2020), tracking the location of an item to provide a purchaser advance notice of delivery, *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1181 (Fed. Cir. 2020), monitoring the performance of an interconnected electric power grid in real time, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016), and transmitting a request for demographic or psychographic user information, saving the user information, and matching the user to a specific advertiser, *In re Morsa*, 809 F.App'x 913, 917 (Fed. Cir. 2020).

By contrast, the following patent claims have been held to not be directed to abstract ideas: using a plurality of network monitors that each analyze specific types of data on the network and integrating the monitors' reports to identify hackers into the network, *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019), a medium for automatically capturing an image of a check through a mobile-phone camera only once the image meets certain specifications, *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, 414 F.Supp.3d 947, 950 (E.D. Tex. 2019), animation software's automatically employing specific, limited mathematical rules instead of animators' prior convention of relying on subjective determinations, *McRO*, 837 F.3d at 1314, a graphical user interface's improving the speed, accuracy, and usability of a system used for trading market commodities, *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F.App'x 1001, 1003 (Fed. Cir. 2017), and a display interface's allowing users to more quickly access stored data and programs in small-screen electronics, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1359 (Fed. Cir. 2018)

## 2.

The Court concludes that claim 1 of the '268 patent is directed to the abstract idea of credentialing visitors and checking them in and out of an access-controlled environment. Credentialing and checking in visitors is a process that long predates the '268 patent. It has been practiced ever since access-controlled facilities have existed. It is also a well-established business practice and a common method for organizing human activity. The '268 patent specification itself explains as much. *See* '268 patent col. 1 ll. 11–13 ("It is a common practice to issue identification badges to

employees at facilities such as hospital or other healthcare facilities, office buildings, factories, and the like.")

The elements of claim 1 clearly delineate a method of accomplishing this longstanding human activity. The elements lay out the process of a visitor's enrolling with the facility, gaining approval by the administrator, requesting access to a location, being granted access, checking in to that location, carrying a badge to signify that the visitor is authorized, and then checking out. The plain object of these steps is to establish a process of credentialing visitors and checking them in and out of the location, as Repifi acknowledges in its complaint. *See* (Dkt. #1 ¶ 7) ("The '268 patent is *directed to* and claims a method for credentialing visitors to an access-controlled environment by an access administrator for use in healthcare facilities." (emphasis added)). It is also confirmed in the '268 patent's specification. *See* '268 patent col. 1 ll. 56–58 ("The present invention is *directed to* a method for credentialing visitors to an access-controlled environment by an access administrator." (emphasis added)).

The fact that claim 1 implements existing technology such as smart phones and electronic badges to make the process more efficient does not save claim 1 from targeting an abstract concept. Claim 1 merely applies existing technology to automate a human process. Nothing in claim 1 indicates that it is directed to an improvement to the technology itself. The specification further confirms this fact. According to the specification, the technology involved in the method includes smart phones and electronic display badges in the form of "a battery-less smart card made by Aioi Systems Co, Ltd." '268 patent col. 5 ll. 24, 62–63. In order for the electronic

badge to display an image showing whether a visitor is authorized, the smart phone sends data to the smart card using "near field communication (NFC), as is well known." '268 patent col. 5 ll. 44–46. And if a smart phone lacks NFC write capability, "a commercially available NFC reader/writer may be used," which can receive communications from the smart phone and transmit them to the electronic badge. '268 patent col. 5 ll. 49–56. The specification makes clear that the technology contemplated by claim 1 is all commercially available technology. Nowhere in claim 1 or in the specification does the '268 patent purport to claim an improvement to how smart phones function, how battery-less smart cards function, or how near-field communication works. Rather, the patent merely applies these conventional technological components in order to improve the abstract process of credentialing visitors.[1]

Repifi contends that claim 1 is not directed to an abstract idea because it includes an electronic badge that displays indicia that are changeable in real time based on the location of the visitor. However, in the *Alice/Mayo* step-one inquiry, the focus is not on the individual, specific elements of the claim. Instead, the focus is on what all the elements, when taken as a whole, indicate that the claim is directed to. Claim 1 is not directed to an electronic badge with indicia that change in real time; rather, the electronic badge is merely one of the steps within the broader method

---

[1] Repifi disputes whether a smart phone constitutes a "generic computer." This argument can be summarily rejected. Regardless of whether Repifi considers smart phones "computers," smart phones are certainly conventional technology, and the Federal Circuit has repeatedly treated them as such when assessing patent validity under Section 101. *See, e.g., Affinity Labs I*, 838 F.3d at 1262; *Consumer 2.0*, 343 F.Supp.3d at 588, *aff'd* 796 F.App'x at 752.

claimed by claim 1. *See* '268 patent col. 6 ll. 54–56 (indicating that the elements of claim 1 "compris[e] the steps" for carrying out the "method for credentialing visitors to an access-controlled environment"). Claim 1 contains thirteen elements, four of which mention an electronic badge, and none of which mention indicia changing in real time. In no sense can claim 1 be read as a whole to be *directed to* an electronic badge with indicia that change in real time.

Repifi's reliance on *United Services* is also unavailing. The patent in *United Services* claimed precisely what claim 1 of the '268 patent does not—a technological improvement to solve a technological problem. 414 F.Supp.3d at 954. The technological improvement claimed by the *United Services* patent enhanced the ability of a smart-phone camera to capture an image of a check such that the information on the check could later be detected and extracted when processed by the bank. *Id.* The patented technology operated such that the smart-phone camera would not take a picture until the image conformed with certain specifications, at which point the camera would "autocapture" an image of the check. *Id.* at 954, 958. The result was that a greater percentage of check images captured with smart-phone cameras were able to present detectable and extractable information when processed by the bank. *Id.* at 955. In other words, in order to solve a technological problem— the difficulty in smart-phone cameras capturing processable images of checks—the patent claimed an improvement to the way smart phones take pictures of checks.

Claim 1 of the '268 patent claims nothing of the sort. Claim 1 is not directed toward solving any problem in the technology itself—it is directed toward making a

human process more efficient. Nor does claim 1 claim an improvement to the functioning of any technology—it merely claims the use of conventional technologies' already-existing functions to aid a human process. Indeed, rather than being analogous to the patent at issue in *United Services*, claim 1 is most comparable to the patents considered in the *Bridge and Post* and *Consumer 2.0* decisions.

In *Bridge and Post*, the patent at issue claimed "a method for providing directed media to a user on a network." 778 F.App'x at 886. When a user accessed a website, the technology would retrieve a persistent device identifier, retrieve information related to that identifier, including data regarding the location and history of the device, analyze the information, and provide targeted marketing based on the analysis. This technological method maximized advertising revenue by delivering real-time information about internet users and their locations. *Id.* at 884. Nonetheless, the Federal Circuit concluded that the patent was "directed to the abstract idea of using persistent identifiers to implement targeted marketing." *Id.* at 887. The court reasoned that targeted marketing is a fundamental concept that existed well before the patent at issue, and the patent claimed nothing more than implementing targeted marketing with a computer over the internet. *Id.* Similarly here, claim 1 of the '268 patent is directed to the longstanding concept of controlling access to certain types of facilities and deploys only conventional, commercially available technologies to improve the abstract process of credentialing visitors.

In *Consumer 2.0*, the patent claimed "[a] method for providing automated entry to properties." 343 F.Supp.3d at 584. The method provided a means for prospective

14

buyers of property to register through their mobile phones and gain automated access to tour properties, obviating the need for the presence of a real-estate agent. *Id.* The court concluded that the patent was directed to the abstract idea of providing access to properties, quoting *Alice* for the proposition that longstanding commercial practices and methods of organizing human activity are abstract ideas. *Id.* at 587–88 (quoting *Alice*, 573 U.S. at 220). Because the technology merely automated a human process, the court concluded that the patent remained directed to an abstract idea. *Id.* at 588. In order to avoid being directed to an abstract idea, the court reasoned that the patent would need to claim some improvement to how computers carry out a function rather than the mere application of existing computer functions to improve an abstract process. *See id.* at 587–88.

The same is true here. Claim 1 of the '268 patent is directed to the abstract idea of controlling access to certain types of facilities, a well-established commercial activity and method of organizing human activity. And, like the patent at issue in *Consumer 2.0*, Repifi's patent merely claims the use of functions already available on conventional technologies, in this case smart phones and electronic display badges, to improve the abstract process of controlling access. For these reasons, the Court concludes that claim 1 is directed to an abstract idea.

## B. *Alice/Mayo* Step Two: Whether Claim 1 Supplies an Inventive Concept

### 1.

Because the Court concludes that claim 1 is directed to an abstract idea, the Court must next determine whether an element of the claim or a combination of

elements "is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217 (cleaned up). The Supreme Court describes step two "as a search for an 'inventive concept.'" *Id.* As part of this inquiry, courts look to both the claims and the specification, though each claim element is considered individually, not in combination as in step one. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("*Affinity Labs II* ") ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."); *Trading Techs.*, 675 F.App'x at 1005. However, "it is not enough just to disclose the improvement in the specification; instead, the Court's task becomes to 'analyze the asserted claims and determine whether they capture these improvements.'" *Align Tech., Inc. v. 3Shape A/S*, 339 F.Supp.3d 435, 443 (D. Del. 2018) (emphasis omitted) (quoting *Berkheimer I*, 881 F.3d at 1369); *see also RecogniCorp*, 855 F.3d at 1327 ("To save a patent at step two, an inventive concept must be evident in the claims."); *Alice*, 573 U.S. at 221 ("[W]e must examine the elements of the claim to determine whether it contains an 'inventive concept.'"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").

Also, in determining inventiveness, courts often analyze whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2359). "Simply appending conventional steps, specified at

16

a high level of generality, [is] not enough to supply an inventive concept," *Alice*, 573 U.S. at 222 (cleaned up), but an inventive combination of conventional limitations may supply an inventive concept. *See Bascom*, 827 F.3d at 1349. Where there is no question on the face of the pleadings that each claim element or ordered combination of elements is well-understood, routine, and conventional, patent eligibility may be resolved on a motion to dismiss. *Berkheimer I*, 881 F.3d at 1368. But, when there exists a question as to "[w]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field," such question is a "question of fact" and "must be proven by clear and convincing evidence." *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F.App'x 989, 995 (Fed. Cir. 2018) (quoting *Berkheimer I*, 881 F.3d at 1368); *see also Aatrix*, 882 F.3d at 1128 ("While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination.").

**2.**

The only element of claim 1 that Repifi contends supplies an inventive concept is the electronic badge. Repifi argues that providing an electronic badge with a display that changes in real time is an improvement over the prior art of providing paper badges. The elements regarding the electronic badge recite the following:

> (a) providing an electronic badge having a display having electronically controlled and changeable indicia thereon, the badge adapted communicate with a smart-phone;
> . . .

(h) communicating between the smart-phone and the electronic badge, indicia data for forming a display image on the display on the electronic badge;

(i) displaying on the badge display indicia showing access by the visitor is authorized to the location during the specific time interval;
. . .
(m) removing from the badge display, the indicia showing access by the visitor is authorized.

'268 patent col. 6 ll. 57–58, col. 7 ll. 12–17, 28–29. The two primary functions of the electronic badge based on these elements are (1) its ability to communicate with a smart phone and (2) its ability to change its display in response to the communications from the smart phone. However, none of the elements lists the technology or the method by which the electronic badge is able to perform these functions. In other words, the elements do not claim any technological improvements to the electronic badge that enable it to communicate with a smart phone and change its display accordingly; rather, the elements simply claim the use of an electronic badge that can perform these functions. *See Affinity Labs I*, 838 F.3d at 1258 ("There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself.").

The specification further supports this conclusion. As noted above, the specification indicates that the electronic badge referenced in claim 1 can be a commercially available smart card with an "e-Paper rewritable display" that is capable of communicating with smart phones that have "NFC write capability."[2]

---

[2] The Court notes that, in its response in opposition, Repifi provides an inaccurate description of the '268 patent specification in an apparent attempt to make the claimed electronic badges seem distinct from generally available badges. Repifi states: "'Currently available display badges may not be capable of communicating directly with smart phones

'268 patent col. 5 ll. 44–67. And for smart phones that do not have NFC write capability, an NFC reader/writer, which is also commercially available, can be used to facilitate communication between the smart phone and the electronic badge. '268 patent col. 5 ll. 49–53. In short, the electronic badge is an off-the-shelf, conventional piece of technology, and nothing in the '268 patent indicates that the badge's ability to communicate with a smart phone and change its display screen is a feature that readily available electronic badges do not have. *See Electric Power*, 830 F.3d at 1355 (concluding that there was no inventive concept when there was "nothing in the patent contain[ing] any suggestion that the displays needed for [purposes of the claimed method] [were] anything but readily available"). Accordingly, the elements regarding the electronic badge do not provide an inventive concept sufficient to transform claim 1 into patentable subject matter.

Nor do the elements, when considered as an "ordered combination," supply an adequate inventive concept. The ordered combination of elements of claim 1 consists of humans carrying out generic human functions (e.g., inputting information,

---

lacking NFC write capability,' at lines 5:56-57, suggesting that standard, garden-variety badges are not fit for the claimed method." (Dkt. #11 at 7). But no such distinction exists between generally available badges and the badges used in Repifi's claimed method. An examination of the paragraph surrounding the language Repifi quotes from the specification reveals that the specification does not at all say what Repifi implies. Repifi suggests that the badges used in its claimed method *are* capable of communicating directly with smart phones that lack NFC write capability, while generally available badges lack such capability. This is untrue. The language quoted by Repifi is derived from a paragraph in the specification explaining that, if a smart phone does not have NFC write capability, then users of Repifi's claimed method will have to use an NFC reader/writer in order for the electronic visitor badge to be able to communicate with the smart phone. '268 patent col. 5 ll. 44–61. In other words, when the specification references "[c]urrently available display badges," '268 patent col. 5 ll. 56–57, it is not *distinguishing* the claimed electronic badges; it is *referring to* the claimed badges. This further indicates that the electronic badges used in the claimed method are, in fact, generally available.

requesting access, and granting approval) and conventional technology carrying out conventional functions (e.g., smart phones using GPS tracking, smart phones storing information, smart phones transmitting data to a smart card–electronic badge, and the smart card–electronic badge responding to the transmitted data). And the only alleged improvements over the prior art provided by the ordered combination all stem from the automation of a historically human process. *See* (Dkt. #11 at 15–16) (arguing that the automated method is a "clear improvement" because it "enhances hospital visitor experiences by promoting efficiency and convenience"). But the automation of the human process cannot be the inventive concept because the automation of the human process is itself the abstract idea. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention significantly more than that ineligible concept." (quotation omitted)). Mere automation of longstanding human processes using conventional technology necessarily increases convenience and efficiency, but that does not make it patentable. Accordingly, claim 1 fails to supply an inventive concept sufficient to convert claim 1 into a claim over patentable subject matter.

*     *     *

Because claim 1 of the '268 patent is directed to an abstract idea and does not contain an inventive concept sufficient to transform the claim into a patent-eligible claim, claim 1 is invalid under 35 U.S.C. § 101. Accordingly, IntelliCentrics's motions

are granted, and Repifi's complaint is dismissed for failure to state a claim upon which relief can be granted.[3]

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendants' Motions to Dismiss, (Dkt. #7, #16), are **GRANTED**. It is further **ORDERED** that Plaintiff's claims are hereby **DISMISSED** without prejudice.

**So ORDERED and SIGNED this 30th day of March, 2021.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

---

[3] The parties dispute whether claim 1 is representative of the other claims in the '268 patent. However, the Court need not address this issue because all of the infringement allegations in Repifi's complaint refer only to claim 1. There are no claims alleging that IntelliCentrics infringed any of the other claims in the '268 patent. Accordingly, the conclusion that claim 1 is invalid mandates dismissal. *See X One, Inc. v. Uber Techs., Inc.*, 239 F.Supp.3d 1174, 1188 (N.D. Cal. 2017) (considering the validity of only those claims that were alleged in the complaint to have been infringed).